

**DEALY & SILBERSTEIN, LLP**
Milo Silberstein (MS 4637)
William J. Dealy (WD 9776)
225 Broadway, Suite 1405
New York, NY 10007
Telephone: (212) 385-0066
Facsimile: (212) 385-2117

**KELLER ROHRBACK L.L.P**
Lynn L. Sarko
Derek W. Loeser
Erin M. Riley
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
Telephone: (206) 623-1900
Facsimile: (206) 623-3384

*Counsel for Plaintiff*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SHELDEN GREENBERG, Individually and On Behalf of All Others Similarly Situated, ) ) ) Plaintiff, ) ) vs. ) ) THE BEAR STEARNS COMPANIES INC., ) JAMES E. CAYNE; ALAN C. GREENBERG; ) JEFFREY MAYER; SAMUEL L. ) MOLINARO, JR.; ALAN D. SCHWARTZ; ) WARREN J. SPECTOR; and JOHN AND ) JANE DOES 1-10, ) ) Defendants. ) ) ) ) ) | **Case No.** **CLASS ACTION** |

**COMPLAINT FOR VIOLATIONS OF THE EMPLOYEE RETIREMENT
INCOME SECURITY ACT**

i

## I. INTRODUCTION

1.        Plaintiff Shelden Greenberg ("Plaintiff") alleges the following based upon personal information as to himself and the investigation of Plaintiff's counsel, which included: a review of U.S. Securities and Exchange Commission ("SEC") filings by The Bear Stearns Companies Inc. ("Bear Stearns" or the "Company"), including Bear Stearns' proxy statements (Form DEF 14A), annual reports (Form 10-K), quarterly reports (Form 10-Q), and current reports (Form 8-K); a review of Forms 5500 filed by The Bear Stearns Companies Inc. Employee Stock Ownership Plan (the "Plan") with the U.S. Department of Labor ("DOL"); interviews with participants of the Plan; and a review of available documents governing the operations of the Plan. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## II. NATURE OF THE ACTION

2.        This is a class action brought on behalf of the Plan pursuant to §§ 502(a)(2) and (a)(3) of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1132(a)(2) & (a)(3), against the fiduciaries of the Plan for violations of ERISA.

3.        The Plan is a retirement plan sponsored by Bear Stearns.

4.        Plaintiff's claims arise from the failure of Defendants, who are fiduciaries of the Plan, to act solely in the interest of the participants and beneficiaries of the Plan, and to exercise the required skill, care, prudence, and diligence in administering the Plan and the Plan's assets from December 14, 2006 to the present (the "Class Period").

5.        Plaintiff alleges that Defendants imprudently permitted the aggressive investment of the participants' assets in Bear Stearns common stock throughout the Class Period, despite the fact that they clearly knew, or should have known, that such investment was unduly risky and

imprudent due to Company's serious mismanagement and improper business practices, including, among other practices: (a) continuing to concentrate its business on high-risk mortgage-backed and asset-backed securities and Collateralized Debt Obligations ("CDO"), despite clear indicators of an unstable, illiquid market for these investment products; (b) failing to adequately manage the Company's liquidity and capital position despite increased risks and exposures; (c) maintaining an overly leveraged position that prevented the Company from securing cash infusions on credit; and (d) making false and misleading statement's about the Company's risks, exposures, and risk management practices, all of which lead to the collapse of the Company and resulted in government intervention, including an unprecedented extension of credit and debt guarantees, and in the pending acquisition by J.P.Morgan Chase & Co. ("J.P.Morgan"). In short, during the Class Period, the Company was seriously mismanaged and faced deteriorating financial circumstances that placed Bear Stearns at risk of collapse and rendered Bear Stearns stock an unduly risky and inappropriate investment option for participants' retirement savings.

6.      Specifically, Plaintiff alleges in Count I that the Defendants who were responsible for the investment of the Plan's assets breached their fiduciary duties to the Plan's participants in violation of ERISA by failing to prudently and loyally manage the Plan's investment in Bear Stearns stock. In Count II, Plaintiff alleges that the Defendants, who were responsible for the selection, monitoring, and removal of the Plan's other fiduciaries, failed properly to monitor the performance of their fiduciary appointees and remove and replace those whose performance was inadequate. In Count III, Plaintiff alleges that the Defendants breached their duty to inform the Plan's participants by failing to provide complete and accurate information regarding the soundness of Bear Stearns stock and the prudence of investing and holding retirement

contributions in Bear Stearns equity. In Count IV, Plaintiff alleges that Defendants breached their duties and responsibilities as co-fiduciaries by failing to prevent breaches by other fiduciaries of their duties of prudent and loyal management, complete and accurate communications, and adequate monitoring.

7.      As more fully explained below, during the Class Period, Defendants imprudently permitted the Plan to hold hundreds of millions of dollars in Bear Stearns stock despite the fundamental problems the Company faced. Based on publicly available information for the Plan, it appears that Defendants' breaches have caused the Plan to lose more than *325 million dollars* of retirement savings.

8.      This action is brought on behalf of the Plan and seeks to recover losses to the Plan for which Defendants are personally liable pursuant to ERISA §§ 409 and 502(a)(2), 29 U.S.C. §§ 1109, and 1132(a)(2). In addition, under § 502(a)(3) of ERISA, 29 U.S.C. § 1132(a)(3), Plaintiff seeks other equitable relief from Defendants, including, without limitation, injunctive relief and, as available under applicable law, constructive trust, restitution, equitable tracing, and other monetary relief.

9.      ERISA §§ 409(a) and 502(a)(2) authorize participants such as the Plaintiff to sue in a representative capacity for losses suffered by the Plan as a result of breaches of fiduciary duty. Pursuant to that authority, Plaintiff brings this action as a class action under Fed. R. Civ. P. 23 on behalf of all participants and beneficiaries of the Plan whose Plan accounts were invested in Bear Stearns common stock during the Class Period.

10.     In addition, because the information and documents supporting Plaintiff's claims are, for the most part, solely in Defendants' possession, certain of Plaintiff's allegations are made by necessity upon information and belief. Once Plaintiff has had the opportunity to conduct

discovery, Plaintiff will, to the extent necessary and appropriate, amend this Complaint, or, if required, seek leave to amend, to add such other additional facts as are discovered that further support Plaintiff's claims.

### III. JURISDICTION AND VENUE

11.    **Subject Matter Jurisdiction.**  This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

12.    **Personal Jurisdiction.**  ERISA provides for nationwide service of process. ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2).  All of the Defendants are either residents of the United States or subject to service in the United States and this Court therefore has personal jurisdiction over them.  This Court also has personal jurisdiction over them pursuant to Fed. R. Civ. P. 4(k)(1)(A) because they would all be subject to the jurisdiction of a court of general jurisdiction in the State of New York.

13.    **Venue.**  Venue is proper in this district pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because the Plan is administered in this district, some or all of the fiduciary breaches for which relief is sought occurred in this district, and Bear Stearns has its principal place of business in this district.

### IV. PARTIES

A.    **Plaintiff**

14.    Plaintiff Shelden Greenberg is a resident of Staten Island, New York.  He worked for Bear Stearns beginning in 1981 and left the Company in 2003.  He is a participant in the Plan within the meaning of ERISA § 3(7), 29 U.S.C. § 1002(7), and held Bear Stearns shares in the Plan during the Class Period.

**B.    Defendants**

15.    **Defendant The Bear Stearns Companies Inc.**  Bear Stearns, a Delaware corporation, is a holding company with its principal place of business at 383 Madison Avenue, New York, New York.   The Company, through its broker-dealer and international bank subsidiaries, is a leading investment banking, securities and derivatives trading, clearance and brokerage firm, providing its services to corporations, governments, and institutional and individual investors worldwide.   Bear Stearns primarily operates in three principal segments: Capital Markets; Global Clearing Services; and Wealth Management.   The Company has approximately 14,153 employees.  Bear Stearns common stock is listed on the New York Stock Exchange and trades under the ticker symbol "BSC".

16.    **Executive Committee Defendants.**  The Bear Stearns Executive Committee is the most senior management committee of the Company.  According to the 2006 Annual Report: "The ultimate approval of decisions regarding the Company's risk appetite and risk-taking capacity rests with the Executive Committee".   *See* 2006 Annual Report, *available at* http://www.bearstearns.com/sitewide/investor_relations/annual_reports/index.htm, at 62.   On information and belief, the following individuals were members of the Executive Committee during the Class Period:

   a.    **Defendant James E. Cayne** served as a member of the Executive Committee from at least February 2001 until, on information and belief, his resignation as an executive officer of Bear Stearns in January 2008.  Defendant Cayne has served as the Chairman of the Company's Board of Directors since 2001.  He previously served as the Company's Chief Executive Officer from 1993 until his resignation from that position in January 2008.

b.      **Defendant Alan C. Greenberg** has served as Chairman of the Executive Committee of Bear Stearns for more than five years.  Defendant Greenberg has also served on the Company's Board of Directors since 1985.

c.      **Defendant Jeffrey Mayer** has served as a member of the Executive Committee of Bear Stearns since August 2007.  Defendant Mayer has also served as the Executive Vice President of the Company since August 2007 and has been Co-Head of the Fixed Income Division of the Company since March 2002.

d.      **Defendant Samuel L. Molinaro, Jr.** has served as a member of the Executive Committee of Bear Stearns since 2002.  Defendant Molinaro has also served as the Company's Chief Operating Officer since August 2007 and has also served as the Company's Executive Vice President since December 2001.  Defendant Molinaro has also served as Bear Stearns' Chief Financial Officer since October 1996.

e.      **Defendant Alan D. Schwartz** has served as a member of the Executive Committee of Bear Stearns since June 2001.  Defendant Schwartz has also served as the Company's Chief Executive Officer since January 2008 and has served as the Company's sole President since August 2007, a position he previously co-shared since June 2001.  He has also served on the Company's Board of Directors since 1999, previously he served as a Director from 1987 through 1996.  Defendant Schwartz also previously served as Bear Stearns' Co-Chief Operating Officer from June 2001 until August 2007.

f.      **Defendant Warren J. Spector** served as a member of the Executive Committee from June 2001 until his resignation from Bear Stearns in August

2007. Defendant Spector also previously served as the Company's President and Co-Chief Operating Officer from June 2001 until his resignation from Bear Stearns in August 2007.

17.     As alleged below, on information and belief, the Executive Committee had certain responsibilities with respect to the Plan, including oversight responsibilities, and the Executive Committee and its members were therefore fiduciaries of the Plan. The Executive Committee and its members listed above are referred to as the "Executive Committee Defendants."

18.     **Investment Committee Defendants**. As explained in more detail below, on information and belief, the Investment Committee Defendants have the responsibility for selecting the investment funds in the Plan and for monitoring the performance of those funds. The identities of the Investment Committee Defendants are currently unknown to Plaintiff and are therefore named fictitiously as John and Jane Does 1-10. Once the identities of the Investment Committee Defendants are ascertained, Plaintiff will seek leave to join them under their true names. The Investment Committee and its members (John and Jane Does 1-10) are referred to as the "Investment Committee Defendants."

## V. THE PLAN

19.     The Plan, sponsored by Bear Stearns, is defined contribution plan. The Plan is a legal entity that can sue and be sued. ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1). However, in a breach of fiduciary duty action such as this, the Plan is neither a defendant nor a plaintiff. Rather, pursuant to ERISA § 409, 29 U.S.C. § 1109, and the law interpreting it, the relief requested in this action is for the benefit of the Plan and its participants and beneficiaries.

20.     The Plan is a combination of two stock bonus plans: (1) a Tax Credit Employee Stock Ownership Plan; and (2) a stock bonus plan and an employee stock ownership plan

("ESOP"), and is qualified and exempt from taxation under § 401(a) the Internal Revenue Code and is subject to the applicable provisions of ERISA. *See* The Bear Stearns Companies Inc. Employee Stock Ownership Plan Financial Statements and Independent Auditors' Report, attached to the Form 5500 for year end Dec. 31, 2006 (hereinafter "Auditors' Report") (Ex. A) at 4.

21.    The Plan became effective on October 29, 1985. *Id.*

22.    The assets of an employee benefit plan, such as the Plan here, must be "held in trust by one or more trustees." ERISA § 403(a), 29 U.S.C. § 1103(a). During the Class Period, the assets of the Plan were held in trust by Custodial Trust Company, the Plan trustee and custodian. *Id.* at 5.    All contributions made to the Plan constituted a form of deferred compensation.

23.    The investments held in the Plan are primarily in Bear Stearns common stock. *Id.*

24.    On information and belief, the Company made contributions to the Plan until December 31, 2004. Contributions to the Plan were made in Bear Stearns Common Stock. On information and belief, participants did not exercise any authority or control over this investment decision.

25.    All employees who were hired before or as of December 31, 2004, except for certain managing directors and certain international employees, are eligible to participate in the Plan. Ex. A at 4.

26.    Participants are fully vested at all times in their account balance and are permitted to redistribute a percentage of their vested assets into The Bear Stearns Companies Inc. Cash or Deferred Compensation Plan. Ex. A at 4-5.

A.    **ESOP Fiduciaries are Bound by Core ERISA Fiduciary Duties.**

27.    An ESOP is an ERISA plan that is designed to invest primarily in "qualifying employer securities." 29 U.S.C. § 1107(d)(6)(A). Fiduciaries of an ESOP remain bound by core ERISA fiduciaries duties, including the duties to act loyally, prudently, and for the exclusive purpose of providing benefits to plan participants.

28.    Accordingly, if the fiduciaries know or if an adequate investigation would reveal that company stock no longer is a prudent investment for the ESOP, the fiduciaries must disregard plan direction to maintain investments in such stock and protect the plan by investing the plan assets in other suitable investments.

B.    **The Plan Incurred Significant Losses during the Class Period.**

29.    During the Class Period, Bear Stearns stock represented significant portions of the Plan's assets.

30.    As of December 31, 2006, the Plan held approximately 2.27 million shares of Bear Stearns stock, then having a market value of approximately $370.2 million. Ex. A at 6.

31.    The Plan has incurred substantial losses as a result of the Plan's investment in Bear Stearns stock. Following revelations of the Company's serious mismanagement and improper business practices, including, among other practices: (a) continuing to concentrate its business on high-risk mortgage-backed and asset-backed securities and CDOs, despite clear indicators of an unstable, illiquid market for these investment products; (b) failing to adequately manage the Company's liquidity and capital position despite increased risks and exposures; (c) maintaining an overly leveraged position that prevented the Company from securing cash infusions on credit; and (d) making false and misleading statement's about the Company's risks,

9

exposures, and risk management practices, Bear Stearns stock has declined approximately 93 percent since the beginning of the Class Period.

## VI.  DEFENDANTS' FIDUCIARY STATUS

### A.    The Nature of Fiduciary Status.

32.    **Named Fiduciaries.**  Every ERISA plan must have one or more "named fiduciaries." ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1).  The person named as the "administrator" in the plan instrument is automatically a named fiduciary, and in the absence of such a designation, the sponsor is the administrator.  ERISA § 3(16)(A), 29 U.S.C. § 1002(16)(A).

33.    **De Facto Fiduciaries.**  ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under § 402(a)(1), 29 U.S.C. § 1102(a)(1), but also any other persons who in fact perform fiduciary functions.  Thus a person is a fiduciary to the extent "(i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan." ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i).

34.    Each of the Defendants was a fiduciary with respect to the Plan and owed fiduciary duties to the Plan and the participants under ERISA in the manner and to the extent set forth in the Plan's documents, through their conduct, and under ERISA.

35.    As fiduciaries, Defendants were required by ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), to manage and administer the Plan, and the Plan's investments solely in the interest

of the Plan's participants and beneficiaries and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

36.     Plaintiff does not allege that each Defendant was a fiduciary with respect to all aspects of the Plan's management and administration. Rather, as set forth below, Defendants were fiduciaries to the extent of the specific fiduciary discretion and authority assigned to or exercised by each of them, and, as further set forth below, the claims against each Defendant are based on such specific discretion and authority.

37.     Instead of delegating all fiduciary responsibility for the Plan to external service providers, on information and belief, Bear Stearns chose to assign the appointment and removal of fiduciaries to the Monitoring Defendants named herein. These persons and entities in turn selected Bear Stearns employees, officers and agents to perform most fiduciary functions.

38.     ERISA permits fiduciary functions to be delegated to insiders without an automatic violation of the rules against prohibited transactions, ERISA § 408(c)(3), 29 U.S.C. § 1108(c)(3), but insider fiduciaries, like external fiduciaries, must act solely in the interest of participants and beneficiaries, not in the interest of the Plan sponsor.

**B.     Bear Stearns' Fiduciary Status.**

39.     The Company was the "Administrator" with respect to Plan, as those terms are defined in ERISA § 3(16)(A). Ex. A at 4.

40.     Moreover, Bear Stearns, at all applicable times, on information and belief, has exercised control over the activities of its employees that performed fiduciary functions with respect to the Plan, and can hire or appoint, terminate, and replace such employees at will. Bear Stearns is, thus, responsible for the activities of its employees through traditional principles of

agency and *respondeat superior* liability.

41.     Finally, under basic tenets of corporate law, Bear Stearns is imputed with the knowledge that the Defendants had regarding the misconduct alleged herein, even if not communicated to Bear Stearns.

42.     Consequently, in light of the foregoing duties, responsibilities, and actions, Bear Stearns was both a named fiduciary of the Plan pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), and a *de facto* fiduciary of the Plan within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21), during the Class Period in that it exercised discretionary authority or discretionary control respecting management of the Plan, exercised authority or control respecting management or disposition of the Plan's assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plan.

43.     Bear Stearns, as a corporate entity, cannot act on its own without any human counterpart. In this regard, during the Class Period, on information and belief, Bear Stearns relied and continues to rely directly on the Executive Committee Defendants to carry out its fiduciary responsibilities under the Plan and ERISA.

C.     **The Executive Committee Defendants' Fiduciary Status.**

44.     The Executive Committee Defendants, as the most senior executives at the Company, signed Bear Stearns' relevant SEC filings during the Class Period, participated in the day-to-day management and overall direction of the Company, participated in the preparation of the statements alleged herein to be false, and on information and belief communicated both directly and indirectly with the Plan's participants. The Executive Committee Defendants were privy to confidential proprietary information concerning the Company and its business, operations, products, growth, financial statements, and financial condition. On information and

belief, the Executive Committee Defendants carried out the duties and responsibilities of the Company with respect to the Plan.

45.    On information and belief, the Executive Committee Defendants, acting on behalf of the Company, appointed the Investment Committee Defendants. Accordingly, the Executive Committee Defendants had the duty to monitor, and to remove, their appointees. Thus, according to DOL regulations, the Executive Committee Defendants exercised a fiduciary function under ERISA. 29 C.F.R. § 2509.75-8 (D-4).

46. Consequently, in light of the foregoing duties, responsibilities, and actions, the Executive Committee Defendants were *de facto* fiduciaries of the Plan within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21), during the Class Period in that, on information and belief, they exercised discretionary authority or discretionary control respecting management of the Plan, exercised authority or control respecting management or disposition of the Plan's assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plan.

**D.    The Investment Committee Defendants' Fiduciary Status.**

47. On information and belief, the Investment Committee is the "named fiduciary" of the Plan for investment purposes as that term is defined under ERISA.

48. On information and belief, the Investment Committee Defendants were both named fiduciaries of the Plan pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), and *de facto* fiduciaries within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21), in that they exercised discretionary authority or discretionary control respecting management of the Plan, exercised authority or control respecting management or disposition of the Plan's assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plan.

13

## VII.  FACTS BEARING ON FIDUCIARY BREACH

**A.**    **Bear Stearns Stock Was an Imprudent Investment for the Plan during the Class Period Because of its Reckless Business Practices, Undisclosed Failure of Liquidity Risk Management, and Related Handling of its Subprime Mortgage Assets.**

**1.    Background.**

49.    During the Class Period, Bear Stearns has been plagued by severe problems that made it imprudent for the Plan's fiduciaries to maintain the Plan's massive investment in the Bear Stearns stock.  As a result of these problems, discussed in detail below, Bear Stearns stock posed an unduly large risk of significant loss and this risk is not one that could be prudently borne by an employee retirement plan.

50.    These risks were exacerbated by false and misleading statements issued by Bear Stearns that caused the price of Bear Stearns stock to be artificially inflated.  As stated by the DOL, the agency charged with enforcing ERISA, it is never prudent for a retirement plan fiduciary to invest Plan assets in artificially inflated stock.

51.    While a fiduciary's duty of prudence does not include a general duty to diversify with respect to company stock in an ERISA-governed retirement plan, a fiduciary has a duty of prudence that includes a duty not to ignore circumstances, such as those alleged here, which increase participants' and beneficiaries' risk of loss and the overall magnitude of that potential loss to an imprudent and unacceptable level.

52.    Several circumstances contributed to the unacceptable level of risk borne by Plan participants as a result of the Plan's massive investment in Bear Stearns stock, including, but not limited to:

- The Company's reckless business practices that precipitated the collapse of two hedge funds managed by Bear Stearns Asset Management;

14

- Bear Stearns' failure to effectively restructure senior management in the wake of the hedge funds' collapse, especially with regard to macro risk management controls;

- Bear Stearns' dramatic increase in exposure to subprime-backed securities throughout the Class Period, despite recognizable signs of distress in the housing market, including rapidly rising delinquency rates on subprime loans;

- The ongoing inflation of asset-values due to the Company's calculating its worth based on assumptions disregarding the actual housing market, credit market, and liquidity conditions affecting the value of subprime and asset-backed securities;

- Bear Stearns' failure to adequately and accurately re-measure the Company's risks during the subprime crisis;

- The expansion of Bear Stearns' CDO business despite increasingly risky market conditions;

- The Company's failure to detect and adequately respond to the sector-wide pressure on Wall Street banks with fixed-income asset-management or CDO business segments that led to tightened credit conditions and increased illiquidity of investment products tied to mortgages;

- The Company's false and misleading statements regarding the dire circumstances it faced as a result of its CDO and subprime investment practices, which caused the price of Bear Stearns stock to be artificially inflated; and

- The sheer magnitude of Bear Stearns' subprime exposure, which made the Company particularly vulnerable to a liquidity crisis.

53.    The risk of significant loss to the Plan was exacerbated by the fact that Bear Stearns stock constituted the lion's share of the Plan's total assets.  Astonishingly, given the profound risk the Company faced due its subprime and CDO exposure, the Plan's fiduciaries did not undertake any meaningful action to protect the Plan from the massive losses that have been caused by the Plan's holding hundreds of millions dollars of Bear Stearns stock while exigent circumstances have beset Bear Stearns during the Class Period.  For example, the Plan's fiduciaries continued to allow investment in Bear Stearns stock even during the time that the stock was plunging in value as a result of the collapse of the CDO and subprime markets.  A prudent fiduciary facing similar circumstances would not have stood idly by as the Plan's assets were decimated.

**2.    Bear Stearns' Persistent Denials of Facts Regarding its Actual Financial Condition.**

54.    Facts regarding Bear Stearns' massive subprime exposure and the Company's reckless business practices and risk management failures were first disclosed in June 2007, when the Company's alternative investments arm began to collapse as a result of excessive risk taken by Bear Stearns' hedge funds.  On June 26, 2007 the Company announced the following:

> The Bear Stearns Companies Inc. (NYSE: BSC) announced today that it has offered to provide up to $3.2 billion in secured financing to The Bear Stearns High-Grade Structured Credit Fund (High-Grade Fund), a hedge fund managed by Bear Stearns Asset Management (BSAM). The Bear Stearns facility, which is in the form of a collateralized repurchase agreement, will enable the Fund to replace current secured financing, improve the Fund's liquidity and facilitate an orderly de-leveraging of the Fund in the marketplace. Over the past few weeks, the High-Grade Fund and The Bear Stearns High-Grade Structured Credit Enhanced Leveraged Fund (Enhanced Fund) have experienced high levels of margin calls and have had difficulty in creating necessary liquidity and working capital to continue to operate the Funds. BSAM will continue to work with creditors and counterparties of the Enhanced Fund to reduce leverage in an orderly manner and improve liquidity.

Bear Stearns Current Report (Form 8-K) (June 26, 2007) at Ex. 99.

55.    Bear Stearns grappled with the negative publicity surrounding the hedge fund catastrophe by reorganizing senior management.   In August 2007, Defendant Spector, an executive with a storied 24 year tenure at Bear Stearns, resigned from the Company.   However, "[a]ccording to people inside the firm, Mr. Spector's position became untenable shortly after the troubles of its two hedge funds became public in June.   Not only did the asset management business report to him but he also had direct responsibility over the risk controls that were in place there."   Landon Thomas Jr., *A Top Official at Bear Stearns Ousted Over Funds Implosion*, N.Y. Times, Aug. 6, 2007.

56.    Commenting on the decision, Defendant Cayne stated: "[i]n light of the recent events concerning BSAM's High Grade and Enhanced Leverage funds, we have determined to make changes in our leadership structure."   Bear Stearns Current Report (Form 8-K) (Aug. 9, 2007) at Ex. 99.1.   Defendant Spector's departure evidenced the failed risk management and massive underperformance in the asset management sector.   These failures would prove symptomatic of the widespread mismanagement and reckless business practices that ultimately contributed to the Company's collapse in market value and near bankruptcy, as alleged below.

57.    As early as August 2007, the hedge funds' collapse was cited an indicator of mounting liquidity concerns in the constricted credit markets.   According to the following *New York Times* article:

> Two Bear Stearns hedge funds were forced to liquidate, and investors lost everything. Investors shied away from buying new mortgage securities, and several lenders went out of business, unable to finance the mortgage loans they had promised to make.
>
> With the credit gears clogged, there has been a sudden lust for cash at many levels of the financial system. Last week banks in Europe and the

> United States tried to borrow so much money that central banks had to
> step in to keep interest rates from rising.

Floyd Norris & Eric Dash, *In a Spiraling Credit Crisis, Large Mortgages Grow Costly*, N.Y.
Times, Aug. 12, 2007.

58.     The collapse of its own hedge funds should have been a signal flare to the

Company that overall liquidity risks were escalating.  Yet, the Company failed to alter its risk

management course and hedge against the imminent risks.

59.     Despite its admitted major risk management oversights in its asset management

division, the Company touted its overall financial vitality.  According to the following *New York

Times* article:

> Bear Stearns' failure to sense the early tremors was especially glaring.  In
> 2006, it was rated as the best risk manager among United States brokerage
> firms in 2006 by Euromoney, a respected trade publication.  Unlike other
> firms, though, Bear's problems eventually claimed a high-profile casualty -
> - in early August, the brokerage firm's co-president and heir apparent,
> Warren J. Spector, was forced to resign.
>
> The company has emphasized that in spite of the damage to its reputation,
> its actual financial losses were relatively small.

Nelson D. Schwartz & Vikas Bajaj, *Credit Time Bomb Ticked, but Few Heard*, N.Y. Times,
Aug. 19, 2007.

60.     Bear Stearns engaged in high-risk leveraged finance during a time of increased

pressure in the mortgage market without adequately implementing liquidity controls to

compensate for the increased risks.  As of June 2007, the Company trumpeted its success in the

leveraged finance sector as an offset to tightened conditions in the credit markets:

> Credit trading results were strong and record net revenues were reported in
> leveraged finance. The credit business produced strong results led by cre-
> dit derivatives and leveraged finance. Mortgage-related revenues reflected
> both industry-wide declines in residential mortgage origination and securi-
> tization volumes and challenging market conditions in the sub-prime and
> Alt-A mortgage sectors.

Bear Stearns Current Report (Form 8-K) (June 14, 2007) at Ex. 99.

61.    In a presentation at the Merrill Lynch Banking & Financial Services Investor Conference on November 14, 2007, Defendant Molinaro showcased the Company's success despite difficult market conditions. Defendant Molinaro presented the Company's relative financial health, depicting Bear Stearns as an opportunist - as opposed to a victim - in light of the distress in the economy.

- Mortgage
  - Diversified mortgage platform – vertical integration creates opportunities
  - Distressed franchise should benefit from current market cycle
- Credit
  - Capitalizing on the secular growth of global debt, corporate bond and derivative markets

Samuel L. Molinaro Jr., *Bear Stearns Companies Inc. Presentation, Merrill Lynch Banking & Financial Services Investor Conference*, Nov. 14, 2007 at 7.

62.    Faced with the prospect of ongoing losses related to the declining credit and mortgage markets, Bear Stearns admitted that the Company was struggling in some of its business segments. However, the Company's disclosures failed to indicate systematic risks that could spread and jeopardize the Company's overall financial health. In reporting results for the third quarter 2007, Defendant Cayne proclaimed the following:

> The third quarter was characterized by extremely difficult securitization markets and high volatility levels across asset classes. While our fixed income results clearly reflect these market conditions, we reported solid revenues in Investment Banking and record revenues in Global Equities and Global Clearing Services…I am confident in the underlying strength of our business and proud of the effort and determination displayed by our employees during these challenging times."

Bear Stearns Current Report (Form 8-K) (Sept. 20, 2007) at Ex. 99.

63.    While Citigroup Inc. and Merrill Lynch & Co., Inc. reported massive write-downs in the fall of 2007, Bear Stearns portrayed itself as comparatively secure.  In November 2007 the Company recorded a write-down that paled in comparison to its Wall Street counterparts and it highlighted its efforts to reevaluate risk given the economy's volatility:

> As of August 31, 2007, the Company had total ABS CDO related expo-sures of approximately $2 billion, which consisted of $963 million of AAA super senior, $165 million below AAA and $944 million of CDO Warehouse. These positions have been materially reduced through No-vember 9, 2007. The CDO Warehouse exposure as of August 31, 2007 has essentially been liquidated or converted into CDO's. The Company's over-all CDO position as of November 9, 2007 was $884 million, down from approximately $2 billion as of August 31, 2007. During the period be-tween August 31, 2007 and November 9, 2007, the Company significantly increased its short subprime exposures reducing the August 31, 2007 net exposure of approximately $1 billion to a negative $52 million net expo-sure as of November 9, 2007.
>
> As a result of the extremely challenging environment, the Company has gone through an exhaustive process of revaluing the mortgage and CDO portfolios. As a result, the Company will be taking a net write-down of approximately $1.2 billion on these positions and others in our mortgage inventory. Net of tax, this write down is approximately $700 million. The vast majority of these losses are attributable to write downs on the CDO and CDO warehouse portfolio. Consequently, the Company anticipates having a loss for the 4th quarter of 2007.

Bear Stearns Current Report (Form 8-K) (Nov. 15, 2007) at Item 8.01.

64.    Despite the Bear Stearns' claims, any adjustments made by the Company were grossly inadequate.  Bear Stearns remained too closely bound to the mortgage-backed securities market; the Company's core business remained overexposed to the deteriorating mortgage and credit environments.  According to the Company's Quarterly Report filed in October 2007:

> The Company acts as portfolio manager in several collateralized debt ob-ligation and collateralized loan obligation transactions. In these transac-tions, the Company establishes a trust that purchases a portfolio of assets and issues trust certificates that represent interests in the portfolio of as-sets. The holders of the trust certificates have recourse only to the underly-

ing assets of the trusts and not to the Company's other assets. In addition, the Company may receive variable compensation for managing the portfolio and may also retain certain trust certificates. In certain of these transactions, these interests result in the Company becoming the primary beneficiary of these entities.

Bear Stearns Quarterly Report (Form 10-Q) (Oct. 10, 2007) at 22.

65.    The Company did disclose specific increased risks and exposures associated with the illiquid market for asset-backed and mortgage-backed securities.  In fact, in a series of filings with the SEC, Bear Stearns itemized its maximum exposure to loss from specific business segments.  The October 2007 Quarterly Report contained the following:

| (in millions) | As of August 31, 2007 | | As of November 30, 2006 | |
| --- | --- | --- | --- | --- |
| | VIE Assets | Maximum Exposure to Loss (1) | VIE Assets | Maximum Exposure to Loss (1) |
| Mortgage Securitizations Collateralized Debt and | $    37,363 | $     1,269 | $    29,984 | $        762 |
| Loan Obligations | 2,459 | 437 | 685 | 48 |
| Employee Funds (2) | 710 | 492 | 575 | 355 |
| Distressed Debt | 72 | 72 | 59 | 59 |
| Energy Investments | 441 | 132 | -- | -- |
| Total | $    41,045 | $     2,402 | $    30,303 | $      1,224 |

Our Capital Markets segment may continue to be adversely affected by the current global credit crisis and repricing of credit risk. During the Company's third fiscal quarter ended August 31, 2007, a global credit crisis coupled with the repricing of credit risk created extremely difficult market conditions. These conditions resulted in greater volatility, less liquidity, widening of credit spreads and a lack of price transparency. The Company's Capital Markets segment operates in these markets with exposure in securities, loans, derivatives and other commitments. It is difficult to predict how long these conditions will exist and which markets, products and businesses of the Company will continue to be affected. As a result, these factors could adversely impact the Company's results of operations.

*Id.* at 67.

66.    Bear Stearns failed to account for the Company's liquidity position and the associated amplification of the Company's exposure to loss due to its leveraged positions in

illiquid securities. This illiquidity of investment products tied to the mortgage market was not an overnight development. By the fall of 2006, uncertainty had entered the marketplace surrounding subprime loans. Bear Stearns was one of many companies forced to grapple with the ambiguities of untested, thinly traded, increasingly illiquid investment products. Yet even after Bear Stearns suffered a marred reputation in the wake of bankrupted hedge funds, the Company failed to adequately adjust its stance to minimize risk.

67. In January 2008, the Bear Stearns hedge fund crisis received additional media coverage in connection with inquiries by U.S. Prosecutors. On this news, Bear Stearns stock continued to drop, closing at $78.87 on January 4, 2008. Despite the increased scrutiny, Bear Stearns again failed to disclose the true condition of the Company's liquidity and capital positions.

68. As recently as March 10, 2008, Defendant Schwartz publicly affirmed that the Company's "balance sheet, liquidity and capital remain strong." Bear Stearns Press Release, *Bear Stearns Denies Liquidity Rumors*, Mar. 10, 2008.

69. But, according to reports in the financial press, concerns about the Company's financial condition had spread throughout the financial community:

> Word began to spread among fixed-income traders nine days ago [March 4, 2008] that European banks had stopped trading with Bear. Some U.S. fixed-income and stock traders began doing the same on Monday, pulling their cash from Bear for fear it could get locked up if there was a bankruptcy.

Kate Kelly, Greg Ip, & Robin Sidel, *Fed Races to Rescue Bears Stearns in Bid to Steady Financial System --- Storied Firm Sees Stock Plunge 47%*, Wall St. J., Mar. 15, 2008.

70. When news of the Bear Stearns liquidity crisis spread, its trading partners halted deals with the Company:

> On Thursday evening [March 13, 2008], Bear Stearns informed the Securities and Exchange Commission and Fed that it had experienced a dramatic loss of cash reserves and saw no option other than to file for bankruptcy protection Friday morning.

Greg Ip, *J.P. Morgan Buys Bear in Fire Sale, As Fed Widens Credit to Avert Crisis --- Central Bank Offers Loans to Brokers, Cuts Key Rate --- Historic Steps*, Wall St. J., Mar. 17, 2008.

71.    On the heels of the public disclosure of the Company's actual condition, the value of Bear Stearns shares plummeted. The following table sets forth the closing price of Bear Stearns common stock between March 11, 2008 and March 17, 2008:

| March 11, 2008 | $62.97 |
| March 12, 2008 | $61.58 |
| March 13, 2008 | $57.00 |
| March 14, 2008 | $30.00 |
| March 17, 2008 | $4.81 |

72.    The Company's collapse triggered government intervention, including an unprecedented extension of credit and debt guarantees. Even after securing that extraordinary government assistance, Bear Stearns agreed to sell itself to J.P.Morgan for a mere $2 per share. *Id.*

73.    In response to investor outrage over the agreed-upon sale price, Bear Stearns and J.P.Morgan announced on March 24, 2008 that J.P.Morgan had quintupled the acquisition price to $10 per share. Bear Stearns Current Report (Form 8-K) (Mar. 24, 2008) at Ex. 99.3.

74.    Assuming that the acquisition is consummated at this figure, the Defendants' failure to fulfill their fiduciary duties will have resulted in losses of more than ***325 million dollars*** for the Plan.

**B.    Defendants Failed to Provide Plan Participants with Complete and Accurate Information about the True Risks of Investment in Bear Stearns in the Plan.**

75.    ERISA mandates that plan fiduciaries have a duty of loyalty to the plan and its

participants which includes the duty to speak truthfully to the plan and its participants when communicating with them.  A fiduciary's duty of loyalty to plan participants under ERISA includes an obligation not to materially mislead, or knowingly allow others to materially mislead, plan participants and beneficiaries.

76.     During the Class Period, on information and belief, Defendants made direct and indirect communications with participants in the Plan which included statements regarding investments in Company stock.  These communications included, but were not limited to, SEC filings, annual reports, and press releases that, on information and belief, were incorporated by reference into Plan documents and/or Plan-related materials, and, thus, were Plan communications undertaken in a fiduciary capacity, in which Defendants failed to disclose that Company stock was not a prudent retirement investment.   The Company regularly communicated with employees, including participants in the Plan, about the performance, future financial and business prospects of the Company's common stock, which was, far and away, the single largest asset of the Plan.

77.     In fact, as late as March 10, 2008, when the Company's stock traded at $62.30 per share, the Company affirmatively misled the Plan's participants, and the investing public, regarding the Company's financial condition.  On that date, the Company issued a press release, which stated:

> The Bear Stearns Companies Inc. today denied market rumors regarding the firm's liquidity. The company stated that there is absolutely no truth to the rumors of liquidity problems that circulated today in the market.
>
> Alan Schwartz, President and CEO of The Bear Stearns Companies Inc., said, "Bear Stearns' balance sheet, liquidity and capital remain strong."

Bear Stearns Press Release, *Bear Stearns Denies Liquidity Rumors*, Mar. 10, 2008.

78.    Even though Defendants knew of the high concentration of the Plan's funds in Company stock during the Class Period, Defendants failed to take any meaningful ameliorative action to protect the Plan and its participants from their heavy investment in an imprudent retirement vehicle, Bear Stearns stock.

79.    In addition, Defendants failed to provide participants, and the market as a whole, with complete and accurate information regarding the true financial condition of the Company. As such, participants in the Plan could not appreciate the true risks presented by investments in Company stock and therefore could not make informed decisions regarding their investments in Company stock in the Plan.

80.    Specifically, Defendants failed to provide the Plan's participants with complete and accurate information regarding the Company's serious mismanagement and improper business practices, including, among other practices: (a) continuing to concentrate its business on high-risk mortgage-backed and asset-backed securities and CDOs, despite clear indicators of an unstable, illiquid market for these investment products; (b) failing to adequately manage the Company's liquidity and capital position despite increased risks and exposures; (c) maintaining an overly leveraged position that prevented the Company from securing cash infusions on credit; and (d) making false and misleading statement's about the Company's risks, exposures, and risk management practices. As such, the participants were not informed of the true risks of investing their retirement assets in the Plan in Bear Stearns stock.

**C.    Defendants Suffered From Conflicts of Interest.**

81.    As ERISA fiduciaries, Defendants are required to manage the Plan's investments, including the investment in Bear Stearns stock, solely in the interest of the participants and beneficiaries, and for the exclusive purpose of providing benefits to participants and

beneficiaries. This duty of loyalty requires fiduciaries to avoid conflicts of interest and to resolve them promptly when they occur.

82.    Conflicts of interest abound when a company that invests plan assets in company stock founders. This is because as the situation deteriorates, plan fiduciaries are torn between their duties as officers and directors for the company on the one hand, and to the plan and plan participants on the other. As courts have made clear "'[w]hen a fiduciary has dual loyalties, the prudent person standard requires that he make a careful and impartial investigation of all invest-ment decisions.'" *Martin v. Feilen,* 965 F.2d 660, 670 (8th Cir.1992) (citation omitted). Here, Defendants breached this fundamental fiduciary duty.

83.    Defendants failed to investigate whether to take appropriate and necessary action to protect the Plan, and instead, chose the interests of the Company over the Plan by continuing to offer Bear Stearns stock as an investment option, and maintain investments in Bear Stearns stock in the Plan.

## VIII.  THE RELEVANT LAW

84.    ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), provides, in pertinent part, that a civil action may be brought by a participant for relief under ERISA § 409, 29 U.S.C. § 1109.

85.    ERISA § 409(a), 29 U.S.C. § 1109(a), "Liability for Breach of Fiduciary Duty," provides, in pertinent part, that:

> any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

86.    ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes individual participants to seek equitable relief from defendants, including, without limitation, injunctive relief and, as available under applicable law, constructive trust, restitution, and other monetary relief.

87.    ERISA §§ 404(a)(1)(A) and (B), 29 U.S.C. §§ 1104(a)(1)(A) & (B), provides, in pertinent part, that:

> a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries, for the exclusive purpose of providing benefits to participants and their beneficiaries, and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

88.    These fiduciary duties under ERISA §§ 404(a)(1)(A) and (B) are referred to as the duties of loyalty, exclusive purpose and prudence and are the "highest known to the law." *Donovan v. Bierwirth*, 680 F.2d 263, 272 n.8 (2d Cir. 1982). They entail, among other things:

(a)    The duty to conduct an independent and thorough investigation into, and to continually monitor, the merits of all the investment alternatives of a plan, including in this instance the Bear Stearns Stock Fund, which invested in Bear Stearns stock, to ensure that each investment is a suitable option for the plan;

(b)    The duty to avoid conflicts of interest and to resolve them promptly when they occur. A fiduciary must always administer a plan with an "eye single" to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor; and

(c)    The duty to disclose and inform, which encompasses: (1) a negative duty not to misinform; (2) an affirmative duty to inform when the fiduciary knows or should know that

silence might be harmful; and (3) a duty to convey complete and accurate information material to the circumstances of participants and beneficiaries.

89.     ERISA § 405(a), 29 U.S.C. § 1105(a), "Liability for Breach by Co-Fiduciary," provides, in pertinent part:

> In addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:
>
> (1) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach;
>
> (2) if, by his failure to comply with section 404(a)(1), 29 U.S.C. § 1104(a)(1), in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or
>
> (3) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

90.     Co-fiduciary liability is an important part of ERISA's regulation of fiduciary responsibility.  Because ERISA permits the fractionalization of the fiduciary duty, there may be, as in this case, several ERISA fiduciaries involved in a given issue, such as the role of company stock in a plan.  In the absence of co-fiduciary liability, fiduciaries would be incentivized to limit their responsibilities as much as possible and to ignore the conduct of other fiduciaries.  The result would be a setting in which a major fiduciary breach could occur, but the responsible party could not easily be identified.  Co-fiduciary liability obviates this.  Even if a fiduciary merely knows of a breach, a breach he had no connection with, he must take steps to remedy it:

> [I]f a fiduciary knows that another fiduciary of the plan has committed a breach, and the first fiduciary knows that this is a breach, the first fiduciary must take reasonable steps under the circumstances to remedy the breach. . . .  [T]he most appropriate steps in the circumstances may be to

notify the plan sponsor of the breach, or to proceed to an appropriate Federal court for instructions, or bring the matter to the attention of the Secretary of Labor.  The proper remedy is to be determined by the facts and circumstances of the particular case, and it may be affected by the relationship of the fiduciary to the plan and to the co- fiduciary, the duties and responsibilities of the fiduciary in question, and the nature of the breach.

1974 U.S.C.C.A.N. 5038, 1974 WL 11542, at 5080.

91.    Plaintiff therefore brings this action under the authority of ERISA § 502(a)(2) for relief under ERISA § 409(a) to recover losses sustained by the Plan arising out of the breaches of fiduciary duties by the Defendants for violations under ERISA § 404(a)(1) and ERISA § 405(a).

## IX.  CAUSES OF ACTION

**A.    Count I:  Failure to Prudently and Loyally Manage the Plan and Assets of the Plan**

92.    Plaintiff incorporates by this reference the paragraphs above.

93.    This Count alleges fiduciary breach against the following Defendants:  Investment Committee Defendants (the "Prudence Defendants").

94.    As alleged above, during the Class Period the Prudence Defendants were named fiduciaries pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), or *de facto* fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), or both.  Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

95.    As alleged above, the scope of the fiduciary duties and responsibilities of the Prudence Defendants included, on information and belief, managing the assets of the Plan for the sole and exclusive benefit of Plan participants and beneficiaries, and with the care, skill, diligence, and prudence required by ERISA.  The Prudence Defendants were directly responsible for, among other things, selecting prudent investment options, eliminating imprudent options, determining how to invest employer contributions to the Plan and directing the trustee regarding

the same, evaluating the merits of the Plan's investments on an ongoing basis, and taking all necessary steps to ensure that the Plan's assets were invested prudently.

96.     Yet, contrary to their duties and obligations under ERISA, the Prudence Defendants failed to loyally and prudently manage the assets of the Plan.  Specifically, during the Class Period, these Defendants knew or should have known that Bear Stearns common stock no longer was a suitable and appropriate investment for the Plan, but was, instead, a highly speculative and risky investment in light of the Company's improper business practices, serious mismanagement, misstatement and omissions that caused the price of Bear Stearns stock to be artificially inflated, and the impending collapse of the price of the stock as a result of these dire circumstances.  Nonetheless, during the Class Period, these Defendants continued maintain the Plan's enormous investment in the Bear Stearns stock.

97.     The Prudence Defendants were obliged to prudently and loyally manage all of the Plan's assets.  However, their duties of prudence and loyalty were especially significant with respect to Company stock because:  (a) company stock is a particularly risky and volatile investment, even in the absence of company misconduct; and (b) participants tend to underestimate the likely risk and overestimate the likely return of investment in company stock. In view of this, the Prudence Defendants were obliged to have in place a regular, systematic procedure for evaluating the prudence of investment in Company stock.

98.     Moreover, the Prudence Defendants failed to conduct an appropriate investigation of the merits of continued investment in Bear Stearns stock even in light of the losses, the Company's highly risky and inappropriate practices, and the particular dangers that these practices posed to the Plan.  Such an investigation would have revealed to a reasonably prudent

fiduciary the imprudence of continuing to maintain investment in Bear Stearns stock under these circumstances.

99.     The Prudence Defendants' decisions respecting the Plan's investment in Bear Stearns stock described above, under the circumstances alleged herein, abused their discretion as ERISA fiduciaries in that a prudent fiduciary acting under similar circumstances would have made different investment decisions.  Specifically, based on the above, a prudent fiduciary could not have reasonably believed that continued investment of the Plan's contributions and assets in Bear Stearns stock was in keeping with the Plan settlor's expectations of how a prudent fiduciary would operate.

100.    The Prudence Defendants were obligated to discharge their duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.  ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B).

101.    According to DOL regulations and case law interpreting this statutory provision, a fiduciary's investment or investment course of action is prudent if: (a) he has given appropriate consideration to those facts and circumstances that, given the scope of such fiduciary's investment duties, the fiduciary knows or should know are relevant to the particular investment or investment course of action involved, including the role the investment or investment course of action plays in that portion of the plan's investment portfolio with respect to which the fiduciary has investment duties; and (b) he has acted accordingly.

102.    Again, according to DOL regulations, "appropriate consideration" in this context includes, but is not necessarily limited to:

- A determination by the fiduciary that the particular investment or investment course of action is reasonably designed, as part of the portfolio (or, where applicable, that portion of the plan portfolio with respect to which the fiduciary has investment duties), to further the purposes of the plan, taking into consideration the risk of loss and the opportunity for gain (or other return) associated with the investment or investment course of action; and

- Consideration of the following factors as they relate to such portion of the portfolio:

    o The composition of the portfolio with regard to diversification;

    o The liquidity and current return of the portfolio relative to the anticipated cash flow requirements of the plan; and

    o The projected return of the portfolio relative to the funding objectives of the plan.

103.    Given the conduct of the Company as described above, the Prudence Defendants could not possibly have acted prudently when they continued to invest the Plan's assets in Bear Stearns stock because, among other reasons:

- The Prudence Defendants knew of and/or failed to investigate the Company's serious mismanagement and improper business practices, including, but not limited to the following, which made the Company an extremely risky and imprudent investment for the Plan:  (a) continuing to concentrate its business on high-risk mortgage-backed and asset-backed securities and CDOs, despite clear indicators of an unstable, illiquid market for these investment products; (b) failing to adequately manage the Company's liquidity and capital position despite

increased risks and exposures; (c) maintaining an overly leveraged position that prevented the Company from securing cash infusions on credit; and (d) making false and misleading statement's about the Company's risks, exposures, and risk management practices.

- The risk associated with the investment in Bear Stearns stock during the Class Period was far above and beyond the normal, acceptable risk associated with investment in company stock;

- This abnormal investment risk could not have been known by the Plan's participants, and the Prudence Defendants knew that it was unknown to them (as it was to the market generally), because the fiduciaries never disclosed it;

- Knowing of this extraordinary risk, and knowing the Plan's participants did not know it, the Prudence Defendants had a duty to avoid permitting the Plan from investing the Plan's assets in Bear Stearns stock; and

- Further, knowing that the Plan was not a diversified portfolio, but was heavily invested in Company stock, the Prudence Defendants had a heightened responsibility to divest the Plan of Company stock if it became or remained imprudent.

104.    The fiduciary duty of loyalty entails, among other things, a duty to avoid conflicts of interest and to resolve them promptly when they occur. A fiduciary must always administer a plan with single-minded devotion to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor. On information and belief, the compensation and tenure of the Prudence Defendants was tied to the performance of Bear Stearns stock and/or the publicly reported financial performance of Bear Stearns. Fiduciaries

laboring under such conflicts, must, in order to comply with the duty of loyalty, make special efforts to assure that their decision making process is untainted by the conflict and made in a disinterested fashion, typically by seeking independent financial and legal advice obtained only on behalf of the plan.

105.    The Prudence Defendants breached their duty to avoid conflicts of interest and to promptly resolve them by, *inter alia*: failing to engage prudent independent advisors who could make independent judgments concerning the Plan's investment in Bear Stearns; failing to notify appropriate federal agencies, including the DOL, of the facts and circumstances that made Bear Stearns stock an unsuitable investment for the Plan; failing to take such other steps as were necessary to ensure that participants' interests were loyally and prudently served; with respect to each of these above failures, doing so in order to avoid adversely impacting their own compensation or drawing attention to Bear Stearns' inappropriate practices; and by otherwise placing their own and Bear Stearns' improper interests above the interests of the participants with respect to the Plan's investment in Bear Stearns stock.

106.    As a consequence of the Prudence Defendants' breaches of fiduciary duties alleged in this Count, the Plan suffered significant losses.  If the Prudence Defendants had discharged their fiduciary duties to prudently invest the Plan's assets, the losses suffered by the Plan would have been minimized or avoided.  Therefore, as a direct and proximate result of the breaches of fiduciary duty alleged herein, the Plan, and indirectly the Plaintiff and the other Class members, lost over 325 million dollars of retirement savings.

107.    Pursuant to ERISA §§ 409, 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109(a), 1132(a)(2) & (a)(3), the Prudence Defendants are liable to restore the losses to the Plan caused by their

breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

**B.     Count II:  Failure to Monitor Fiduciaries**

108.     Plaintiff incorporates by this reference the allegations above.

109.     This Count alleges fiduciary breach against the following Defendants: the Executive Committee Defendants (the "Monitoring Defendants").

110.     As alleged above, during the Class Period the Monitoring Defendants were named fiduciaries pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), or *de facto* fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), or both.  Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

111.     As alleged above, on information and belief, the scope of the fiduciary responsibilities of the Monitoring Defendants included the responsibility to appoint, and remove, and thus, monitor the performance of the Investment Committee Defendants.

112.     Under ERISA, a monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment and holding of plan assets, and must take prompt and effective action to protect the plan and participants when they are not.

113.     The monitoring duty further requires that appointing fiduciaries have procedures in place so that on an ongoing basis they may review and evaluate whether the "hands-on" fiduciaries are doing an adequate job (for example, by requiring periodic reports on their work and the plan's performance, and by ensuring that they have a prudent process for obtaining the information and resources they need).  In the absence of a sensible process for monitoring their appointees, the appointing fiduciaries would have no basis for prudently concluding that their

appointees were faithfully and effectively performing their obligations to plan participants or for deciding whether to retain or remove them.

114.    Furthermore, a monitoring fiduciary must provide the monitored fiduciaries with complete and accurate information in their possession that they know or reasonably should know that the monitored fiduciaries must have in order to prudently manage the plan and the plan assets, or that may have an extreme impact on the plan and the fiduciaries' investment decisions regarding the plan.

115.    On information and belief, the Monitoring Defendants breached their fiduciary monitoring duties by, among other things: (a) failing, at least with respect to the Plan's investment in Company stock, to monitor their appointees, to evaluate their performance, or to have any system in place for doing so, and standing idly by as the Plan suffered enormous losses as a result of their appointees' imprudent actions and inaction with respect to Company stock; (b) failing to ensure that the monitored fiduciaries appreciated the true extent of Bear Stearns' highly risky and inappropriate business practices, and the likely impact of such practices on the value of the Plan's investment in Bear Stearns stock; (c) to the extent any appointee lacked such information, failing to provide complete and accurate information to all of their appointees such that they could make sufficiently informed fiduciary decisions with respect to the Plan's assets; and (d) failing to remove appointees whose performance was inadequate in that they continued to maintain investments in Bear Stearns stock despite their knowledge of practices that rendered Bear Stearns stock an imprudent investment during the Class Period for participants' retirement savings in the Plan, and who breached their fiduciary duties under ERISA.

116.    As a consequence of the Monitoring Defendants' breaches of fiduciary duty, the Plan suffered tremendous losses.  If the Monitoring Defendants had discharged their fiduciary

monitoring duties as described above, the losses suffered by the Plan would have been minimized or avoided. Therefore, as a direct and proximate result of the breaches of fiduciary duty alleged herein, the Plan, and indirectly the Plaintiff and the other Class members, lost over 325 million dollars of retirement savings.

117. Pursuant to ERISA §§ 409, 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109(a), 1132(a)(2) and (a)(3), the Monitoring Defendants are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

C.    **Count III: Breach of Fiduciary Duty – Failure to Provide Complete and Accurate Information to the Plan's Participants and Beneficiaries.**

118. Plaintiff incorporates by this reference the allegations above.

119. This Count alleges fiduciary breach against the following Defendants: the Company and the Executive Committee Defendants (the "Communications Defendants").

120. At all relevant times, as alleged above, Defendants listed in this Count were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

121. On information and belief, at all relevant times, the scope of the fiduciary responsibility of the Communications Defendants included the communications and material disclosures to the Plan's participants and beneficiaries.

122. The duty of loyalty under ERISA requires fiduciaries to speak truthfully to participants, not to mislead them regarding the plan or plan assets, and to disclose information that participants need in order to exercise their rights and interests under the plan. This duty to inform participants includes an obligation to provide participants and beneficiaries of the plan

with complete and accurate information, and to refrain from providing false information or concealing material information, regarding plan investment options so that participants can make informed decisions with regard to the prudence of investing in such options made available under the plan. This duty applies to all of the Plan's investment options, including investment in Bear Stearns stock.

123.    Because investments in the Plan were not diversified (*i.e.* the Defendants chose to heavily invest the Plan's assets in Bear Stearns stock), such investment carried with it an inherently high degree of risk. This inherent risk made the Communications Defendants' duty to provide complete and accurate information particularly important with respect to Bear Stearns stock.

124.    The Communications Defendants breached their duty to inform participants by failing to provide complete and accurate information regarding Bear Stearns' serious mismanagement and improper business practices and public misrepresentations, and the consequential artificial inflation of the value of Bear Stearns stock, and, generally, by conveying incomplete information regarding the soundness of Bear Stearns stock and the prudence of investing and holding retirement contributions in Bear Stearns equity. These failures were particularly devastating to the Plan and its participants; a heavy percentage of the Plan's assets was invested in Bear Stearns stock during the Class Period and, thus, losses in this investment had a significant impact on the value of participants' retirement assets.

125.    The Communications Defendants' omissions clearly were material to participants' ability to exercise informed control over their Plan accounts, as in the absence of the information, participants did not know the true risks presented by the Plan's investment in Bear Stearns stock.

126.    The Communications Defendants' omissions and incomplete statements alleged herein were Plan-wide and uniform in that Defendants failed to provide complete and accurate information to any of the Plan's participants.

127.    The Communications Defendants in this Count were unjustly enriched by the fiduciary breaches described in this Count.

128.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly the Plaintiff and the Plan's other participants and beneficiaries, lost a significant portion of their retirement investment.

129.    Pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) and ERISA § 409(a), 29 U.S.C. § 1109(a), the Communications Defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

**D.    Count IV:  Co-Fiduciary Liability**

130.    Plaintiff incorporates by this reference the allegations above.

131.    This Count alleges co-fiduciary liability against the following Defendants: the Company, the Executive Committee Defendants, and the Investment Committee Defendants (the "Co-Fiduciary Defendants").

132.    As alleged above, during the Class Period the Co-Fiduciary Defendants were named fiduciaries pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), or *de facto* fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), or both.  Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

133.    As alleged above, ERISA § 405(a), 29 U.S.C. § 1105, imposes liability on a fiduciary, in addition to any liability which he may have under any other provision, for a breach of fiduciary responsibility of another fiduciary with respect to the same plan if knows of a breach

and fails to remedy it, knowingly participates in a breach, or enables a breach. The Co-Fiduciary Defendants breached all three provisions.

134. **Knowledge of a Breach and Failure to Remedy.** ERISA § 405(a)(3), 29 U.S.C. § 1105, imposes co-fiduciary liability on a fiduciary for a fiduciary breach by another fiduciary if, he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach. Each Defendant knew of the breaches by the other fiduciaries and made no efforts, much less reasonable ones, to remedy those breaches. In particular, they did not communicate their knowledge of the Company's illegal activity to the other fiduciaries.

135. Bear Stearns, through its officers and employees, was unable to meet its business goals, engaged in highly risky and inappropriate business practices, withheld material information from the market, and profited from such practices, and, thus, knowledge of such practices is imputed to Bear Stearns as a matter of law.

136. Because Defendants knew of the Company's failures and inappropriate business practices, they also knew that the Prudence Defendants were breaching their duties by continuing to maintain investments in Company stock in the Plan. Yet, they failed to undertake any effort to remedy these breaches. Instead, they compounded them by downplaying the significance of Bear Stearns' failed and inappropriate business practices, and obfuscating the risk that the practices posed to the Company, and, thus, to the Plan.

137. **Knowing Participation in a Breach.** ERISA § 405(a)(1), 29 U.S.C. § 1105(1), imposes liability on a fiduciary for a breach of fiduciary responsibility of another fiduciary with respect to the same plan if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach. Bear Stearns

knowingly participated in the fiduciary breaches of the Prudence Defendants in that it benefited from the sale or contribution of its stock at prices that were disproportionate to the risks for Plan participants.  Likewise, the Monitoring Defendants knowingly participated in the breaches of the Prudence Defendants because, as alleged above, they had actual knowledge of the facts that rendered Bear Stearns stock an imprudent retirement investment and yet, ignoring their oversight responsibilities, permitted the Prudence Defendants to breach their duties.

138.    **Enabling a Breach.**  ERISA § 405(a)(2), 29 U.S.C. § 1105(2), imposes liability on a fiduciary if by failing to comply with ERISA § 404(a)(1), 29 U.S.C. §1104(a)(1), in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled another fiduciary to commit a breach.

139.    The Monitoring Defendants' failure to monitor the Investment Committee Defendants and enabled that Committee to breach its duties.

140.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly the Plaintiff and the Plan's other participants and beneficiaries, lost over 325 million dollars of retirement savings.

141.    Pursuant to ERISA §§ 409, 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109(a), 1132(a)(2) and (a)(3), the Co-Fiduciary Defendants are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

## X. CAUSATION

142.    The Plan suffered more than 325 million dollars in losses because the Plan's assets were imprudently invested by Defendants in Bear Stearns stock during the Class Period, in breach of Defendants' fiduciary duties.

143.    Defendants are liable for the Plan's losses in this case because the Plan's investment in Bear Stearns stock was the result of the Prudence Defendants' decision to maintain the assets of the Plan in Bear Stearns stock.  Thus, the Prudence Defendants are liable for these losses because they failed to take the necessary and required steps to ensure effective and informed independent participant control over the investment decision-making process, as required by ERISA § 404(c), 29 U.S.C. § 1104(c), and the regulations promulgated thereunder.

144.    Had the Defendants properly discharged their fiduciary and co-fiduciary duties, including the monitoring and removal of fiduciaries who failed to satisfy their ERISA-mandated duties of prudence and loyalty, eliminating Bear Stearns stock as an investment alternative when it became imprudent, and divesting the Plan of Bear Stearns stock when maintaining such an investment became imprudent, the Plan would have avoided some or all of the losses that it, and indirectly, the participants suffered.

## XI.  REMEDY FOR BREACHES OF FIDUCIARY DUTY

145.    The Defendants breached their fiduciary duties in that they knew or should have known the facts as alleged above, and therefore knew or should have known that the Plan's assets should not have been invested in Bear Stearns stock during the Class Period.

146.    As a consequence of the Defendants' breaches, the Plan suffered significant losses.

147.    ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) authorizes a plan participant to bring a civil action for appropriate relief under ERISA § 409, 29 U.S.C. § 1109.  Section 409 requires "any person who is a fiduciary…who breaches any of the…duties imposed upon fiduciaries…to make good to such plan any losses to the plan…."  Section 409 also authorizes "such other equitable or remedial relief as the court may deem appropriate…."

148.    With respect to calculation of the losses to the Plan, breaches of fiduciary duty result in a presumption that, but for the breaches of fiduciary duty, the Plan would not have maintained its investments in the challenged investment and, instead, prudent fiduciaries would have invested the Plan's assets in the most profitable alternative investment available to them. The Court should adopt the measure of loss most advantageous to the Plan. In this way, the remedy restores the Plan's lost value and puts the participants in the position they would have been in if the Plan had been properly administered.

149.    Plaintiff and the Class are therefore entitled to relief from the Defendants in the form of: (a) a monetary payment to the Plan to make good to the Plan the losses to the Plan resulting from the breaches of fiduciary duties alleged above in an amount to be proven at trial based on the principles described above, as provided by ERISA § 409(a), 29 U.S.C. § 1109(a); (b) injunctive and other appropriate equitable relief to remedy the breaches alleged above, as provided by ERISA §§ 409(a), 502(a)(2) and (3), 29 U.S.C. §§ 1109(a), 1132(a)(2) and (3); (c) injunctive and other appropriate equitable relief pursuant to ERISA § 502(a)(3), 29 U.S.C. 1132(a)(3), for knowing participation by a non-fiduciary in a fiduciary breach; (d) reasonable attorney fees and expenses, as provided by ERISA § 502(g), 29 U.S.C. § 1132(g), the common fund doctrine, and other applicable law; (e) taxable costs and interest on these amounts, as provided by law; and (f) such other legal or equitable relief as may be just and proper.

150.    Under ERISA, each Defendant is jointly and severally liable for the losses suffered by the Plan in this case.

## XII. CLASS ACTION ALLEGATIONS

151.    **Class Definition.**  Plaintiff brings this action as a class action pursuant to Rules 23(a), (b)(1), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Plaintiff and the following class of persons similarly situated (the "Class"):

152.    All persons, other than Defendants, who were participants in or beneficiaries of the Plan at any time between December 14, 2006 and the present and whose accounts included investments in Bear Stearns stock.

153.    **Class Period.**  The fiduciaries of the Plan knew or should have known at least by December 14, 2006 that the Company's material weaknesses were so pervasive that Bear Stearns stock could no longer be offered as a prudent investment for the retirement Plan.

154.    **Numerosity.**  The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to the Plaintiff at this time, and can only be ascertained through appropriate discovery, Plaintiff believes there are, based on the Plan's Form 5500 for Plan year 2006, over 8,400 participants or beneficiaries in the Plan.

155.    **Commonality.**  Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    whether Defendants each owed a fiduciary duty to Plaintiff and members of the Class;

(b)    whether Defendants breached their fiduciary duties to Plaintiff and members of the Class by failing to act prudently and solely in the interests of the Plan's participants and beneficiaries;

(c)    whether Defendants violated ERISA; and

(d)    whether the Plan has suffered losses and, if so, what is the proper measure of damages.

156.    **Typicality.**  Plaintiff's claims are typical of the claims of the members of the Class because:  (a) to the extent Plaintiff seeks relief on behalf of the Plan pursuant to ERISA § 502(a)(2), his claim on behalf of the Plan is not only typical to, but identical to a claim under this section brought by any Class member; and (2) to the extent Plaintiff seeks relief under ERISA § 502(a)(3) on behalf of himself for equitable relief, that relief would affect all Class members equally.

157.    **Adequacy.**   Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action, complex, and ERISA litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

158.    **Rule 23(b)(1)(B) Requirements.**  Class action status in this ERISA action is warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the actions, or substantially impair or impede their ability to protect their interests.

159.    **Other Rule 23(b) Requirements.**  Class action status is also warranted under the other subsections of Rule 23(b) because: (1) prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants; (2) Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect

to the Class as a whole; and (3) questions of law or fact common to members of the Class predominate over any questions affecting only individual members and a class action is superior to the other available methods for the fair and efficient adjudication of this controversy.

### XIII.  PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for:

A.     A Declaration that the Defendants, and each of them, have breached their ERISA fiduciary duties to the participants;

B.     A Declaration that the Defendants, and each of them, are not entitled to the protection of ERISA § 404(c)(1)(B), 29 U.S.C. § 1104(c)(1)(B);

C.     An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent investment of the Plan's assets, and to restore to the Plan all profits the Defendants made through use of the Plan's assets, and to restore to the Plan all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

D.     Imposition of a Constructive Trust on any amounts by which any Defendant was unjustly enriched at the expense of the Plan as the result of breaches of fiduciary duty;

E.     An Order requiring Defendants to appoint one or more independent fiduciaries to participate in the management of the Plan's investment in Bear Stearns stock;

F.     Actual damages in the amount of any losses the Plan suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

G.     An Order awarding costs pursuant to 29 U.S.C. § 1132(g);

H.     An Order awarding attorneys' fees pursuant to the common fund doctrine, 29 U.S.C. § 1132(g), and other applicable law; and

I.    An Order for equitable restitution and other appropriate equitable and injunctive relief against the Defendants.

Dated: April 3, 2008.

Respectfully submitted,

**DEALY & SILBERSTEIN, LLP**

By: _____

Milo Silberstein (MS 4637)
William J. Dealy (WD 9776)
225 Broadway, Suite 1405
New York, NY 10007
Telephone:  (212) 385-0066
Facsimile:  (212) 385-2117

**KELLER ROHRBACK L.L.P**
Lynn L. Sarko
Derek W. Loeser
Erin M. Riley
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
Telephone:  (206) 623-1900
Facsimile:  (206) 623-3384

*Counsel for Plaintiff*

**EXHIBIT A**

840517701.165.05.0001

**Form 5500**

Department of the Treasury
Internal Revenue Service

Department of Labor
Employee Benefits Security
Administration

Pension Benefit Guaranty Corporation

# Annual Return/Report of Employee Benefit Plan

This form is required to be filed under sections 104 and 4065 of the Employee Retirement Income Security Act of 1974 (ERISA) and sections 6047(e), 6057(b), and 6058(a) of the Internal Revenue Code (the Code).

▶ Complete all entries in accordance with the Instructions to the Form 5500.

Official Use Only
OMB Nos. 1210-0110
1210-0089

**2006**

This Form is Open to Public Inspection.

## Part I — Annual Report Identification Information

For the calendar plan year 2006 or fiscal plan year beginning _____ , and ending _____

**A** This return/report is for: (1) ☐ a multiemployer plan; (3) ☐ a multiple-employer plan; or
(2) ☒ a single-employer plan (other than a multiple-employer plan); (4) ☐ a DFE (specify) _____

**B** This return/report is: (1) ☐ the first return/report filed for the plan; (3) ☐ the final return/report filed for the plan;
(2) ☐ an amended return/report; (4) ☐ a short plan year return/report (less than 12 months).

**C** If the plan is a collectively-bargained plan, check here . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ▶ ☐

**D** If filing under an extension of time or the DFVC program, check box and attach required information. (see instructions) . . . . . . . . . . . . . . . . ▶ ☒

## Part II — Basic Plan Information — enter all requested information.

**1a** Name of plan
THE BEAR STEARNS COMPANIES INC EMPLOYEE STOCK OWNERSHIP PLAN

**1b** Three-digit plan number (PN) ▶ 007

**1c** Effective date of plan (mo., day, yr.)
10/29/1985

**2a** Plan sponsor's name and address (employer, if for a single-employer plan)
(Address should include room or suite no.)
THE BEAR STEARNS COMPANIES INC

383 MADISON AVE
TAX DEPARTMENT

NEW YORK                    NY    10179-0024

**2b** Employer Identification Number (EIN)
13-3286161

**2c** Sponsor's telephone number
212-272-2000

**2d** Business code (see instructions)
523110

**Caution:** A penalty for the late or incomplete filing of this return/report will be assessed unless reasonable cause is established.

Under penalties of perjury and other penalties set forth in the instructions, I declare that I have examined this return/report, including accompanying schedules, statements and attachments, as well as the electronic version of this return/report if it is being filed electronically, and to the best of my knowledge and belief, it is true, correct and complete.



| SIGN HERE | | | |
|---|---|---|---|
| Signature of plan administrator | 10/9/07 Date | MARK HAYNIE | Type or print name of individual signing as plan administrator |



| SIGN HERE | | | |
|---|---|---|---|
| Signature of employer/plan sponsor/DFE | 10/8/07 Date | MAUREEN MCNICHOLAS | Type or print name of individual signing as employer, plan sponsor or DFE |

For Paperwork Reduction Act Notice and OMB Control Numbers, see the Instructions for Form 5500.    v9.1    Form 5500 (2006)

0 2 0 6 0 1 0 1 0 A

# Deloitte.

840317701.166.03.0013

## *The Bear Stearns Companies Inc.*
## *Employee Stock Ownership Plan*

**Financial Statements**
**and Independent Auditors' Report**

As of December 31, 2006 and 2005 and for
the Year Ended December 31, 2006
*Supplemental Schedule*
December 31, 2006

Member of
Deloitte Touche Tohmatsu

840317701.166.03.0014

# THE BEAR STEARNS COMPANIES INC.
# EMPLOYEE STOCK OWNERSHIP PLAN

## TABLE OF CONTENTS

| | Page |
|---|---|
| INDEPENDENT AUDITORS' REPORT | 1 |
| FINANCIAL STATEMENTS: | |
| Statements of Net Assets Available for Benefits as of December 31, 2006 and 2005 | 2 |
| Statement of Changes in Net Assets Available for Benefits Year Ended December 31, 2006 | 3 |
| Notes to Financial Statements as of December 31, 2006 and 2005, and for the Year Ended December 31, 2006 | 4-7 |
| SUPPLEMENTAL SCHEDULE AS OF DECEMBER 31, 2006 - | |
| Form 5500, Schedule H, Part IV, Line 4i – Schedule of Assets (Held At End of Year) December 31, 2006 | 8 |

All other schedules required by Section 2520.103-10 of the Department of Labor's Rules and Regulations for Reporting and Disclosure under the Employee Retirement Income Security Act of 1974 have been omitted because they are not applicable.

840517701.166 03.0015

# Deloitte.

Deloitte & Touche LLP
Two World Financial Center
New York, NY 10281-1414
USA

Tel: +1 212 436 2000
Fax. +1 212 436 5000
www.deloitte.com

**INDEPENDENT AUDITORS' REPORT**

To the Executive Committee of The Bear Stearns Companies Inc.
and the Participants of The Bear Stearns Companies Inc.
Employee Stock Ownership Plan:

We have audited the accompanying statements of net assets available for benefits of The Bear Stearns
Companies Inc. Employee Stock Ownership Plan (the "Plan") as of December 31, 2006 and 2005, and
the related statement of changes in net assets available for benefits for the year ended December 31,
2006. These financial statements are the responsibility of the Plan's management. Our responsibility is
to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with auditing standards generally accepted in the United States
of America. Those standards require that we plan and perform the audit to obtain reasonable assurance
about whether the financial statements are free of material misstatement. An audit includes
consideration of internal control over financial reporting as a basis for designing audit procedures that
are appropriate in the circumstances, but not for the purpose of expressing an opinion on the
effectiveness of the Plan's internal control over financial reporting. Accordingly, we express no such
opinion. An audit also includes examining, on a test basis, evidence supporting the amounts and
disclosures in the financial statements, assessing the accounting principles used and significant
estimates made by management, as well as evaluating the overall financial statement presentation. We
believe that our audits provide a reasonable basis for our opinion.

In our opinion, such financial statements present fairly, in all material respects, the net assets available
for benefits of the Plan at December 31, 2006 and 2005, and the changes in net assets available for
benefits for the year ended December 31, 2006 in conformity with accounting principles generally
accepted in the United States of America.

Our audits were conducted for the purpose of forming an opinion on the basic financial statements
taken as a whole. The accompanying supplemental schedule listed in the Table of Contents is
presented for the purpose of additional analysis and is not a required part of the basic financial
statements, but is supplementary information required by the Department of Labor's Rules and
Regulations for Reporting and Disclosure under the Employee Retirement Income Security Act of
1974. This schedule is the responsibility of the Plan's management. Such schedule has been subjected
to the auditing procedures applied in our audit of the basic 2006 financial statements, and in our
opinion, is fairly stated in all material respects when considered in relation to the basic financial
statements taken as a whole.

*Deloitte & Touche LLP*

September 27, 2007

Member of
Deloitte Touche Tohmatsu

840317701.166.03.0016

# THE BEAR STEARNS COMPANIES INC.
# EMPLOYEE STOCK OWNERSHIP PLAN

## STATEMENTS OF NET ASSETS AVAILABLE FOR BENEFITS
## AS OF DECEMBER 31, 2006 AND 2005

|  | 2006 | 2005 |
|---|---|---|
| ASSETS: |  |  |
| Investments at fair value: |  |  |
| The Bear Stearns Companies Inc. common shares | $ 370,235,134 | $ 281,796,270 |
| Money market fund | 216,642 | 611,506 |
| Total assets | 370,451,776 | 282,407,776 |
|  |  |  |
| NET ASSETS AVAILABLE FOR BENEFITS | $ 370,451,776 | $ 282,407,776 |

See accompanying notes.

840317701.166 03.0017

# THE BEAR STEARNS COMPANIES INC.
# EMPLOYEE STOCK OWNERSHIP PLAN

### STATEMENT OF CHANGES IN NET ASSETS AVAILABLE FOR BENEFITS
### YEAR ENDED DECEMBER 31, 2006

| | |
|---|---:|
| ADDITIONS: | |
| Company contribution | $ 105,380 |
| | |
| Investment income: | |
| Net appreciation in the fair value of investments | 110,925,681 |
| Dividends | 2,638,126 |
| Interest | 26,502 |
| | |
| Total additions | 113,695,689 |
| | |
| DEDUCTIONS: | |
| Dividend distributions | 1,432,052 |
| Distributions to participants | 17,969,005 |
| | |
| Total deductions | 19,401,057 |
| | |
| INCREASE IN NET ASSETS | 94,294,632 |
| | |
| TRANSFERS TO THE BEAR STEARNS COMPANIES INC. | |
| CASH OR DEFERRED COMPENSATION PLAN | 6,250,632 |
| | |
| NET ASSETS AVAILABLE FOR BENEFITS: | |
| Beginning of year | 282,407,776 |
| End of year | $ 370,451,776 |

See accompanying notes.

- 3 -

840517701.166.03.0018

# THE BEAR STEARNS COMPANIES INC.
# EMPLOYEE STOCK OWNERSHIP PLAN

**NOTES TO FINANCIAL STATEMENTS AS OF**
**DECEMBER 31, 2006 AND 2005, AND FOR THE**
**YEAR ENDED DECEMBER 31, 2006**

## 1.  DESCRIPTION OF THE PLAN

The following description of The Bear Stearns Companies Inc. Employee Stock Ownership Plan (the "Plan") is provided for general information purposes only. Participants should refer to the Plan agreement for a more complete description of the Plan's provisions.

*General* - The Plan, adopted effective October 29, 1985, is a defined contribution plan which is a combination of two stock bonus plans pursuant to Section 401(a) of the Internal Revenue Code (the "Code"). One portion of the Plan constitutes a Tax Credit Employee Stock Ownership Plan under Section 409 of the Code. The other portion of the Plan constitutes a stock bonus plan under Section 401(a) of the Code and an employee stock ownership plan within the meaning of Section 4975(e)(7) of the Code and is subject to the applicable provisions of the Employee Retirement Income Security Act of 1974 ("ERISA"). There were no loans outstanding during the year ended December 31, 2006.

Effective April 30, 1993, The Bear Stearns Companies Inc. 1992 Employee Stock Ownership Plan (the "1992 ESOP") was merged with the Plan. All assets and liabilities of the 1992 ESOP were transferred to the Plan. All participants in the 1992 ESOP as of April 30, 1993 became participants in the Plan on such date.

As of January 1, 2002, the Plan was amended to reflect certain provisions of the Economic Growth and Tax Relief Reconciliation Act of 2001.

*Eligibility* - The Plan covers all employees of The Bear Stearns Companies Inc. (the "Company", "BSC" or "Plan Administrator") and its affiliates who were hired before or as of December 31, 2004, except for senior managing directors who are not registered representatives and certain international employees. Participants who become senior managing directors are no longer entitled to future Company contributions, if any, and Plan forfeiture allocations.

*Contributions* - Participant contributions are not permitted. During the year ended December 31, 2006, the Company made a contribution equal to the amount required to reinstate balances of rehired participants.

*Vesting* - All participants are fully vested at all times in their account balance.

*Termination* - The Company has the right to terminate or partially terminate the Plan at any time subject to the provisions of ERISA. Upon termination of the Plan, each participant's account balance shall be distributed to the participant in one lump sum as soon as administratively practicable.

*Dividend Distributions* - Dividends earned on BSC common shares held by the Plan are paid to the participants. A participant may elect to reinvest cash dividends earned on BSC common shares held in his or her account.

*Distributions to Participants* - At termination of service, a participant may receive the value of the vested interest in his or her account as a lump-sum distribution. These lump-sum distributions are either made in the form of cash or the Company's common shares plus cash for any fractional share.

- 4 -

840517701.166.03.0019

*Transfers to The Bear Stearns Companies Inc. Cash or Deferred Compensation Plan* - Transfers relate to funds that have been requested by eligible participants to be transferred to The Bear Stearns Companies Inc. Cash or Deferred Compensation Plan ("401(k)"). All participants are permitted to re-distribute a percentage of their vested assets to the 401(k).

2.  SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

*Basis of Presentation* - The financial statements of the Plan are prepared in conformity with accounting principles generally accepted in the United States of America. These principles require management to make certain estimates and assumptions which may affect the amounts reported in the financial statements and accompanying notes. Actual results could differ materially from these estimates.

*Valuation of Investments* - The BSC common shares are stated at fair value which is defined as the quoted market price at the close of business on the last business day of the Plan year. These shares are traded on a national securities exchange. The money market account is valued on a fair value basis as reported by Custodial Trust Company ("CTC"). Purchases and sales of securities are recorded on a trade date basis.

*Income Recognition* - Interest income is recorded on an accrual basis. Dividend income is recorded on the ex-dividend date.

*Adoption of New Accounting Guidance* - In September 2006, the FASB issued SFAS No. 157, *"Fair Value Measurements"* ("SFAS No. 157"). SFAS No. 157 defines fair value, establishes a framework for measuring fair value and requires enhanced disclosures about fair value measurements. SFAS No. 157 requires companies to disclose the fair value of its financial instruments according to a fair value hierarchy. SFAS No. 157 is effective for financial statements issued for fiscal years beginning after November 15, 2007. The impact of SFAS No. 157 on the Plan's financial statements is currently being evaluated.

*Expenses* - The Company is entitled to reimbursement for the expenses of establishing and administering the Plan, subject to certain limitations; however, the Company may elect to pay all expenses without reimbursement by the Plan. For the year ended December 31, 2006, all administrative expenses of the Plan were paid for by the Company.

*Risks and Uncertainties* - The Plan includes two types of investment securities, equities and money market funds. Investment securities are exposed to various risks such as interest rate, market and credit risk. Due to the level of risk exposure associated with certain investment securities, it is at least reasonably possible that changes in risk in the near term would materially affect participants' account balances and the amounts reported in the Statements of Net Assets Available for Benefits and changes therein.

*Payment of Benefits* - Benefits are recorded when paid.

3.  INVESTMENTS

Investments held by the Plan primarily consist of common stock of the Company. A listing of all investments as of December 31, 2006 is shown on the accompanying Form 5500, Schedule H, Part IV, Line 4i – Schedule of Assets (Held At End of Year). All investments are nonparticipant-directed.

840317701.166.03.0020

The following table presents the number of shares, all of which have been allocated to participants, and fair value of such shares held by CTC, the trustee and custodian for the Plan, as determined by quoted market prices of the securities as of December 31, 2006 and 2005:

|  | December 31, 2006 | December 31, 2005 |
|---|---|---|
| The Bear Stearns Companies Inc. Common Shares: |  |  |
| Number of shares | 2,274,451 | 2,439,161 |
| Cost | $ 27,554,542 | $ 28,202,938 |
| Fair value | $370,235,134 | $281,796,270 |
| Dreyfus Institutional Government Fund: |  |  |
| Number of shares | 216,642 | 611,506 |
| Cost | $ 216,642 | $ 611,506 |
| Fair value | $ 216,642 | $ 611,506 |

The Plan's investment in BSC common shares, at fair value, represents investments greater than 5 percent of net assets available for benefits.

During the year ended December 31, 2006, the shares of BSC held by the Plan appreciated in value by $110,925,681.

4.  **TAX STATUS**

The Internal Revenue Service ("IRS") has determined and informed the Company by letter dated November 12, 2003 that the Plan, as amended, and related trust are designed in accordance with applicable sections of the Code. The Plan has been amended and restated to comply with recent legislation. The Plan Administrator believes that the Plan is currently designed and being operated in compliance with the applicable requirements of the Code and has applied for a new determination letter from the IRS. Therefore, no provision for income taxes has been included in the Plan's financial statements.

5.  **RELATED PARTY TRANSACTIONS**

CTC, a limited purpose trust company registered in New Jersey and a wholly owned subsidiary of the Company, assumes the role of the Plan's trustee and custodian. CTC clears the security transactions through Bear, Stearns Securities Corp., also a subsidiary of the Company.

The Company provides general office overhead and space at no cost to the Plan. In addition, certain officers and employees of the Company who are participants in the Plan perform administrative services related to the operation, recordkeeping and financial reporting of the Plan.

840317701 166.03.0021

The Company absorbs these costs and other administrative expenses on behalf of the Plan.

6.   **BENEFIT CLAIMS PAYABLE**

At December 31, 2006 and 2005, Plan assets of $1,714,162 and $1,767,942, respectively, represented accounts of persons who have terminated employment, elected to withdraw from participation in the Plan and requested payment of their accounts. These payments were made in January 2007 and 2006, respectively.

\* \* \* \* \* \*

840517701.166.05 0022

# THE BEAR STEARNS COMPANIES INC.
# EMPLOYEE STOCK OWNERSHIP PLAN

**FORM 5500, SCHEDULE H, PART IV, LINE 4I-**
**SCHEDULE OF ASSETS (HELD AT END OF YEAR)**
**DECEMBER 31, 2006**

| Identity of Issue, Borrower, Lessor or Similar Party | Description of Investment Including Maturity Date, Rate of Interest, Collateral, Par, or Maturity Value | Cost | Current Value |
|---|---|---|---|
| * The Bear Stearns Companies Inc. | Common Stock; 2,274,451 shares | $ 27,554,542 | $ 370,235,134 |
| Dreyfus Institutional Government Fund | Money Market; 216,642 shares | 216,642 | 216,642 |
| TOTAL | | $ 27,771,184 | $ 370,451,776 |

* Represents party-in-interest to the Plan.

- 8 -

840317701.166.05.0023

| Form **5558** | **Application for Extension of Time** | OMB No. 1545-0212 |
|---|---|---|
| (Rev. January 2007) Department of the Treasury Internal Revenue Service | **To File Certain Employee Plan Returns** ▶ For Paperwork Reduction Act Notice, see instructions on page 3. | **File With IRS Only** |

## Part I    Identification

| A  Name of filer, plan administrator, or plan sponsor (see instructions) | B  Filer's identifying number (see instructions) |
|---|---|
| The Bear Stearns Companies Inc. | ☑ Employer identification number (EIN) |
| Number, street, and room or suite no. (if a P.O. box, see instructions) | 13 | 3286161 |
| 383 Madison Ave, Tax Department | ☐ Social security number (SSN) |
| City or town, state, and ZIP code | |
| New York, NY 10179 | |

| C | Plan name | Plan number | Plan year ending— MM | DD | YYYY |
|---|---|---|---|---|---|
| 1 | The Bear Stearns Companies Inc. Cash or Deferred Comp Plan | 0 0 5 | 12 | 31 | 06 |
| 2 | The Bear Stearns Companies Inc. Employee Profit Sharing Plan | 0 0 1 | 12 | 31 | 06 |
| 3 | The Bear Stearns Companies Inc. Employee Stock Ownership Plan | 0 0 7 | 12 | 31 | 06 |

## Part II    Extension of Time to File Form 5500 or Form 5500-EZ (see instructions)

1  I request an extension of time until __10__ / __15__ / __2007__ to file Form 5500 or Form 5500-EZ.

The application is automatically approved to the date shown on line 1 (above) if: (a) the Form 5558 is filed on or before the normal due date of Form 5500 or 5500-EZ for which this extension is requested, and (b) the date on line 1 is no more than 2½ months after the normal due date.

You must attach a copy of this Form 5558 to each Form 5500 and 5500-EZ filed after the due date for the plans listed in C above.

**Note.** A signature is not required if you are requesting an extension to file Form 5500 or Form 5500-EZ.

## Part III    Extension of Time to File Form 5330 (see instructions)

2  I request an extension of time until _____ / _____ / _____ to file Form 5330.

You may be approved for up to a six (6) month extension to file Form 5330, after the normal due date of Form 5330.

| a  Enter the Code section(s) imposing the tax . . . . . . . . . . . ▶ | a |  |
|---|---|---|
| b  Enter the payment amount attached . . . . . . . . . . . . ▶ | b |  |
| c  For excise taxes under section 4980 or 4980F of the Code, enter the reversion/amendment date . . . ▶ | c |  |

3  State in detail why you need the extension

......................................................................................................

......................................................................................................

Under penalties of perjury, I declare that to the best of my knowledge and belief, the statements made on this form are true, correct, and complete, and that I am authorized to prepare this application.

Signature ▶ _[signature]_          Date ▶ 2/23/07

| Notice to Applicant | To Be Completed by the IRS If Part III is completed ▼ |
|---|---|
| | ☐ This application for extension to file Form 5330 IS approved to the date shown on line 2. (You must attach an approved copy of this form to each Form 5330 that was granted an extension.) |
| **To Be Completed by the IRS If Part III is Completed** | ☐ The date entered on line 2 is more than the 6-month maximum time allowed for Form 5330. This application is approved to ................................................. (You must attach an approved copy of this form to each Form 5330 that was granted an extension.) |
| | ☐ The application for an extension for Form 5330 is not approved, because it was filed after the normal due date of the return. (A 10-day grace period is not granted.) |
| | ☐ This application for an extension for Form 5330 is not approved, because: |
| | ☐ The application was not signed. |
| | ☐ No reason was given on this application or the reason was not acceptable. |
| | ☐ No payment was attached for the tax due on Form 5330. |
| | ☐ Other ▶ .................................................................. |
| | A 10-day grace period is granted from the date shown below or the due date of the return, whichever is later. (You must attach a copy of this form to each return you file that is granted a grace period.) |

_____ (Date)          _____ (Director)          By: _____

Applicants for extension of Form 5330: Complete if you want this Form 5558 returned to an address other than the address shown above.

| Print or Type | Name |
|---|---|
| | Bear Stearns & Co. Inc. - Attn: Mark Haynie |
| | Number, street, and room or suite no. (if a P.O. box, see instructions.) |
| | 115 South Jefferson Road, Bldg C - 1st Floor |
| | City or town, state, and ZIP code |
| | Whippany, NJ 07881 |

Cat. No. 12005T          Form **5558** (Rev. 1-2007)

840317701.166.05.0024

# SCHED. SSA
# REMOVED
# FROM
# FILING



840317701 166.03.0025

Extremely Urgent

This envelope is for use with the following services: UPS Next Day Air®
UPS Worldwide Express™
UPS 2nd Day Air®

Call 1-800-PICK-UPS (1-800-742-5877) or visit UPS.com®.

Apply shipping documents on this side.

UPS NEXT DAY AIR

KS 660 1-01

OCT 16 2007

1 OF 1



799900010Z